# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **Aiquire Inc. d/b/a Pixis** | Civil Action No. _____ |
| Plaintiff, | |
| **v.** | **DEMAND FOR JURY TRIAL** |
| **Climaty.AI Technologies Private Ltd., Turbostart US LP, Turbostart US Holdings Corp., Neel Kishore Pandya, Ravichander Sethu Rao, Mrudula Patre, and Ankur Ashok Chaturvedi,** | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiff Aiquire Inc., d/b/a Pixis ("Pixis"), by and through its undersigned counsel, hereby makes this Complaint for Injunctive Relief and Damages against Defendants Climaty.AI Technologies Private Ltd. ("Climaty"); Turbostart US LP, Turbostart US Holdings Corp. (collectively "Turbostart"); Neel Pandya ("Pandya"); Ravichander Rao ("Rao"); Mrudula Patre ("Patre");, and Ankur Ashok Chaturvedi ("Chaturvedi") (collectively the "Defendants").   In support hereof, Pixis states as follows:

### I.        INTRODUCTION

1.        This action arises out of Defendants' ongoing scheme to unfairly compete against Pixis by building a nearly identical business on the back of Pixis's confidential information and trade secrets, which Defendants tortiously and otherwise unlawfully obtained and misappropriated.

2.        Pandya, Patre, Chaturvedi, and Rao each had access to Pixis's trade secrets and confidential information through their close relationships with Pixis or one of its wholly-owned subsidiaries—Pandya as the CEO, Patre as the Head of Middle East and North Africa, Chaturvedi

as a vendor contracted to aid in developing Pixis' proprietary technology, and Rao as an advisor. Defendants worked in concert to steal the confidential information necessary to launch a competing business, Climaty.

3.      By bringing this action, Pixis seeks to prevent Defendants from continuing to violate their legal duties owed to Pixis and to recover all legal remedies available to Pixis based on Defendants' extensive unlawful conduct.

## II.      JURISDICTION AND VENUE

4.      This Court has original jurisdiction over the subject matter of this action under 28 U.S.C. § 1331 because Pixis asserts claims against Defendants for violations of federal law under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § *et seq*.  This Court has supplemental jurisdiction over Pixis's state-law claims under 28 U.S.C. § 1367(a) because they are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

5.      Venue is proper in this judicial district pursuant to 28 U.S.C § 1391 because Pixis is incorporated in Delaware.  Further, venue is proper in this judicial district pursuant to 28 U.S.C § 1391(b)(3) because there is no district in which an action may otherwise be brought, and therefore, venue is proper in any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

6.      This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(2) in that: (a) this action arises under federal law; (b) Climaty and Turbostart are not subject to the jurisdiction in any state courts of general jurisdiction; and (c) exercising jurisdiction over these entities is consistent with the United States Constitution, as held for example in *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403 (Fed. Cir. 2009) and *Lismont v. Alexander Binzel Corp.*, 2013 WL 6095461 (E.D. Va. Nov. 18, 2013). This Court further has personal jurisdiction over

each named Defendant because, as set forth in greater detail below: (x) each Defendant committed an intentional tort; (y) Pixis felt the brunt of the harm in this forum; and (z) the Defendants' tortious conduct was directly aimed at the forum state, making this forum the focal point of the tortious activity. This Court further has personal jurisdiction over Rao and Pandya because each of them entered into contracts with Pixis containing choice of law and venue selection provisions in favor of the State of Delaware. Additionally, Pandya has traveled into the United States on numerous occasions on business that is relevant to this dispute, and, on information and belief, Patre, Rao, and Chaturvedi have significant business ties to the United States, including specific business relationships that are relevant to this dispute. This Court has personal jurisdiction over Turbostart because Turbostart is organized under the laws of the State of Delaware. Turbostart is actively doing business in the United States, including within the State of Delaware.

7.      All conditions precedent to the filing of this action have been performed, satisfied, or waived.

### III.     FACTUAL BACKGROUND

**A.     Pixis's Business and Confidential Information**

8.      Pixis is a U.S. corporation incorporated in Delaware, with offices in New York, Colorado, Idaho, New Jersey, Texas, Maryland, Illinois, and California, and with employees across the United States. Pixis is the parent company to Leapus Technologies Private Limited (d/b/a Pixis India) ("Pixis India"), an Indian company with 100% ownership of Pixis AI Inc., a U.S. corporation incorporated in Delaware. Aiquire AI FZ-LLC ("Pixis UAE") is a Free Zone Limited Liability Company and the Middle East affiliate of Pixis AI, and is wholly owned by Pixis.

9.      Pixis is a marketing and advertising company founded in 2020. Pixis's industry-leading and proprietary Prism and Adroom platforms leverage AI to provide marketing and advertising strategy, planning, and insights. The Prism and Adroom platforms are designed

primarily to help Pixis's clients and customers: (a) target the right audience for their marketing and ad campaigns; (b) assist with managing their marketing and ad budgets to maximize the return on investment; and (c) evaluate and map the creative content of a marketing or ad campaign, strengthening that content by identifying what can or should be changed. In short, Pixis's value proposition is the optimization of its clients' marketing and ad campaigns.

10.     The technology underlying Pixis's Prism and Adroom platforms gives Pixis a significant market advantage over its competitors. The use of artificial intelligence and its application to many different industries, including marketing and advertising, is in its infancy, and Pixis's status as an early adopter of AI in its marketing and advertising platform is one of the things that differentiates Pixis in the marketplace. Pixis distinguishes itself from competitors through its trade secret technology and highly confidential business practices, methods, and information.

11.     From a technological perspective, Pixis's confidential information and trade secrets include, but are not limited to, the proprietary algorithms, coding, and overall functionality of its three separate but interconnected AI tools that are used to deliver results to its clients. Internal materials containing, discussing, and/or describing Pixis's technology are also highly confidential and trade secret protected.

12.     Beyond materials relating to its technology, among other things, the following also constitute Pixis's confidential information and trade secrets: (a) non-public information relating to Pixis's clients and prospects; (b) Pixis's financial information, including its costs, investments, and profit margins; (c) the specifications, terms, and pricing of Pixis's agreements with its vendors, clients, prospects, and other business partners; (d) information on business opportunities and potential lead sources and clients; (e) business strategies; and (f) intellectual property strategies. This list is not exhaustive.

13.    Pixis has also developed and maintained, at significant expense, valuable and long-standing working relationships and substantial goodwill with its clients and prospective clients. The relationships, reputation, and goodwill Pixis has built with its clients and prospective clients—along with its reputation in the broader competitive marketplace—provides Pixis significant business and strategic advantages over its competitors.

14.    Similarly, Pixis has developed and maintained, at significant expense, agreements with its clients, prospective clients, and lead sources; the specifications, terms, and pricing of Pixis's agreements with its clients, prospective clients, and lead sources is confidential information that provides Pixis significant business and strategic advantages over competitors.

15.    Because the use of AI, including the use of AI in marketing and advertising, is a new and rapidly developing field, theft and misappropriation of Pixis's confidential and trade secret materials have the potential to cause incalculable and irreparable harm to Pixis's business and ability to compete in the market.  Likewise, misappropriation of that same confidential and trade secret material by a direct competitor would provide incredible advantages to that competitor, as that competitor need not invest the same time, money, and resources in developing its own technology, market and client strategies, financial insights, client base, and know-how.

16.    Pixis takes reasonable efforts to maintain the confidentiality of its trade secret materials, including contractual, physical, technical, and operational controls.  For example, Pixis takes at least the following security measures: (a) Pixis requires physical security measures at each of its office locations to prevent unauthorized access; (b) Pixis requires two-factor authentication for all systems, ensuring only authorized users can access Pixis systems and documents; (c) Pixis uses secure data repository platforms for storage of internal data; and (d) Pixis uses software to enforce device encryption across all company-managed devices.  Further, Pixis's company policy

5

requires employees, consultants, advisors, and vendors to execute a non-disclosure agreement before they are given access to company systems. Pixis requires that each of its wholly-owned subsidiaries, including Pixis India and Pixis UAE, follows these security measures to protect Pixis's trade secret and confidential materials.

17. Pixis's confidential information and trade secrets are the property of and are owned by Pixis.

18. Pixis's employees and advisors, and the employees and advisors of Pixis's wholly-owned subsidiaries, are bound by strict contractual agreements to protect confidential information. These include confidentiality clauses that survive after their engagement and in perpetuity, and Pixis maintains systems designed to monitor for and identify potential exfiltration of its confidential information and trade secrets.

19. Pixis's employee handbook outlines a variety of policies intended to protect Pixis's confidential information and trade secrets. For example, the handbook lists "disclosure of confidential information" as "unacceptable" conduct, and states that "[i]t is extremely important that all such information remain confidential, and particularly not be disclosed to Aiquire Inc's competitors." Further, the handbook requires remote workers to "take all appropriate steps to safeguard the Company's confidential business information, including segregating it from personal papers and documents, not allowing nonemployees to access such information, and keeping such information in locked drawers or file cabinets when not in use." Moreover, the handbook prohibits employees from "unauthorized use of the Company's intellectual property" and mandates that all confidential information must be returned to the company upon an employee's separation therefrom. Violations of these confidentiality and proprietary information safeguards are grounds for disciplinary action, including termination.

**B.**     **Defendants' Relationships with Pixis**

20.     Pandya was an employee of Pixis India starting in June 2021, when he became the CEO of Pixis India.  In April 2023, Pandya was hired as the CEO of Japan and Asia-Pacific ("JAPAC") and Middle East and North Africa ("MENA") regions for Pixis UAE.  During the time he was employed as the CEO of Pixis UAE and/or Pixis India, Pandya was responsible for managing all aspects of Pixis's business operations, both internationally and within the United States. This specifically included oversight of and responsibility for Pixis's financial performance, key client relationships, and business strategy.

21.     Pandya had unfettered access to all of Pixis's most confidential information and trade secrets, with practically no oversight, given his role as the CEO of Pixis's wholly-owned subsidiaries and his responsibility for Pixis's global operations. The very highest levels of trust were placed in Pandya; Pixis expected him at all times to act with integrity, placing Pixis's interest foremost in his professional dealings and activities.

22.     Chaturvedi entered into a vendor agreement with Pixis on behalf of Sunrock Advisors Pvt. Ltd. ("Sunrock") in December 2021 (the "Sunrock Vendor Agreement").  Pandya introduced Chaturvedi to Pixis and advocated for the Sunrock Vendor Agreement.  Under the Sunrock Vendor Agreement, Sunrock developed certain features for the "Insights Platform" technology stack.  During the course of this work, Sunrock had access to Pixis's most confidential and trade secret technical information related to the Insights Platform.  The Insights Platform is now a key component of Pixis's AI technological offerings.

23.     Chaturvedi, then a Director at Sunrock, oversaw the execution of the technical development under the Sunrock Vendor Agreement and execution of the associated statements of work.  The Sunrock Vendor Agreement included explicit confidentiality provisions restricting the use and exploitation of Pixis's confidential information.  Defendant Chaturvedi's work for Pixis

gave Chaturvedi deep knowledge of the technology underpinning Pixis's products and services. Chaturvedi was given access to some of Pixis's most confidential information and trade secrets. He was contractually and legally obligated to protect and not disclose Pixis's confidential information and trade secrets for any purpose not related directly to Pixis's business.

24.    In January 2022, Pandya hired his wife, Patre, to serve as Pixis UAE's Director of Sales for MENA through a third-party Employer of Record ("EOR").  Patre served in that role until October 2022, when she was promoted to a new role, Head of MENA, again through a third-party EOR.  Although Patre was engaged through a third-party EOR, she was exclusively assigned to work for Pixis UAE.  Patre was employed by Pixis UAE until October 3, 2025.

25.    Patre had high levels of access to Pixis's most confidential information and trade secrets, given her role as the Head of MENA for Pixis UAE. The very highest levels of trust were placed in Patre as a key managerial employee; Pixis expected her at all times to act with integrity, placing Pixis's interest foremost in her professional dealings and activities.

26.    Turbostart consists of two US entities organized under the laws of the State of Delaware, both wholly owned by non-party Turbostart LLP, a venture capital and private equity firm based in India.  On information and belief, Turbostart is actively doing business in the United States, including within the State of Delaware.  In January 2023, Turbostart launched its MENA arm, with Rao serving as a Founding Partner and CEO.

27.    Also around January 2023, Pandya introduced Rao to Pixis and advocated for Rao to become a Global Knowledge Advisor.  On January 1, 2023, Rao formally entered into an agreement with Pixis as a Global Knowledge Advisor and received a restricted stock unit agreement ("RSU agreement").  The RSU agreement contains a choice of law and venue selection provision in favor of the State of Delaware.  As a Global Knowledge Advisor, Rao obtained

confidential insights into Pixis's business strategy and operations.  At the request of Pandya, Rao also received product demonstrations for himself and the broader Turbostart team.

28.     Pandya continued in his role as CEO until his employment ended on March 31, 2025.

## C.     Defendants' Confidentiality Obligations to Pixis

29.     Pandya and Patre, as a function of their relationships with Pixis as high-level executives and management personnel, were prevented by law and contract from misusing Pixis's confidential information and misappropriating Pixis's trade secrets.

30.     Rao and Chaturvedi, as a function of their relationships with Pixis as advisors and vendors, were prevented by law and contract from misusing Pixis's confidential information and misappropriating Pixis's trade secrets.

31.     In addition to the legal limitations on Rao, Pandya, Chaturvedi, and Patre, each of the Defendants was bound by contractual obligations to maintain confidentiality.  These obligations differed slightly based on the relationship with each Defendant, but all of the Defendants' agreements with Pixis included confidentiality clauses covering the use and disclosure of confidential information.

32.     Rao entered into a "Global Knowledge Partner's Engagement" Agreement (the "GKPEA") with Pixis on January 1, 2023.  Under the GKPEA, Rao acknowledged that he would "obtain confidential information of the Corporation" such as "strategies, markets, market analyses, projections, technology, products and services development, products and services, sales and marketing plans, financials, personnel, partners, customers, trade secrets, know-how and the Materials" and agreed to "hold the Confidential information in strict confidence."  Under paragraph six of the GKPEA, Rao's obligation to hold confidential information in "strict

confidence" "survive[s] any termination of [the] agreement."  Rao signed the GKPEA, and Rao received compensation from Pixis in exchange for the covenants he made.

33.    Pandya entered into an employment agreement with Pixis on April 17, 2023 (the "Pandya Employment Agreement"). The Pandya Employment Agreement contained robust and detailed confidentiality provisions.    The Pandya Employment Agreement provides that "The Employee shall not, whether during his/her employment, or after the cessation of his/her employment, *in perpetuity*, for any reason, direct or indirectly, use for himself/herself or use for the disclosure to any Person any Confidential Information." Confidential Information includes all intellectual property, including any and all proprietary data of Pixis, its affiliates, and any of their respective clients, business, technical, and operational information, including information related to clients, vendors, company strategies, and financial details. Pixis's employee handbook similarly established an obligation for Pandya to maintain the confidentiality of company business and technical information, both during and after his employment.

34.    Chaturvedi provided technology and vendor services to Pixis under the Sunrock Vendor Agreement.  Under the Sunrock Vendor Agreement, Chaturvedi agreed that he, Sunrock, and Sunrock's employees would "not use any Confidential Information of [] Pixis and [] that none of its employees, agents and representatives will use or otherwise exploit or make copies thereof for any purpose or in any manner other than as per the terms and conditions of this Agreement." Chaturvedi and Sunrock further agreed that any work product created under the Sunrock Vendor Agreement belongs to Pixis.

35.    On October 26, 2022, Patre entered into an employment agreement with Pixis (the "Patre Employment Agreement"). The Patre Employment Agreement included a confidentiality clause that applied during employment and after the termination of that employment, without time

10

limit.  The Patre Employment Agreement provides that confidential information includes financial information, business methods, corporate plans, business strategy, marketing plans, information relating to and details of clients, customers, prospective clients, suppliers, trade secrets, research activities, inventions, designs, and know-how.  Patre's confidentiality obligation continues "after the termination of this Offer (without limit in time)." Pixis's employee handbook similarly established an obligation for Patre to maintain the confidentiality of company business information, both during and after her employment. Patre's termination letter reiterated her obligation to maintain "confidentiality and data protection policies."

**D.    The Formation of Climaty**

36.    Before Pandya left Pixis in March 2025, he, Chaturvedi, and Rao started Climaty, a marketing and advertising company that leverages AI to "design[] strategies tailored to objectives, adapt[] creatives for channels and audiences, analyze[] performance in real time, and reallocate[] budgets to maximize ROI." One need look no further than Climaty's publicly-available website to confirm that Climaty's offerings directly mimic Pixis's:





37.     In short, Climaty is a direct competitor to Pixis, offering nearly identical products and services.

38.     Climaty was incorporated in the UAE in November 2024.  Climaty formed an additional entity in India in March 2025.  Rao is the CEO of Climaty's UAE entity, and both Pandya and Chaturvedi are Directors of Climaty's India entity.  On information and belief, Patre is an employee of, and/or investor in, Climaty.

39.     Climaty was formed in November 2024, while Pandya was still working for Pixis as CEO; while Patre was still working for Pixis UAE as head of MENA; while Rao was serving as a Global Knowledge Advisor to Pixis; and while Pixis's Vendor Agreement with Sunrock and Chaturvedi was still in effect.

40.     Pandya, Patre, Chaturvedi, and Rao were preparing to launch Climaty, a direct competitor to Pixis, while all four had access to Pixis's confidential information and trade secrets, as described above.

41.     Additionally, the initial results of Pixis's ongoing internal forensic investigation show that Patre and Pandya intentionally and unlawfully retained, and intentionally exfiltrated,

Pixis's confidential information and trade secrets from Pixis's systems to devices and/or accounts in the possession, custody, and/or control of Patre, Pandya, and/or the other Defendants for the use by and benefit of all Defendants.  On information and belief, Rao and Chaturvedi also engaged in similar misconduct.  All Defendants were aware of and participated in, assisted with, and/or conspired in these actions, and all Defendants acted with specific intent to harm Pixis and unfairly benefit and enrich Defendants.

42.    On information and belief, Defendants used Pixis's confidential information and trade secrets in the formation and operation of Climaty.  The convergence of the types of confidential information and trade secrets available to each of Pandya, Patre, Chaturvedi, and Rao formed a triangulated channel through which Pixis's confidential information, trade secrets, and know-how could be repurposed to form Climaty and compete with Pixis using Pixis's confidential information and trade secrets.

43.    In October 2025, by and through Rao, Turbostart invested US $2 Million in Climaty in furtherance of the Defendants' unlawful conspiracy to compete with Pixis by using Pixis's confidential information, trade secrets, and know-how.

**E.    Defendants Negotiate Pandya's Exit from Pixis Using Fraud and Deceit**

44.    In early 2025, Pixis approached Pandya about his declining performance as CEO. In response, Pandya represented to Pixis that his declining performance was due to health concerns and that he intended to take a sabbatical in order to care for his health.

45.    Those representations by Pandya were false. In fact, at the time he made those representations to Pixis, Pandya had already formed Climaty and was deep in the process of setting up the operations his competing business.  This is demonstrated by the fact that Climaty was incorporated in November 2024, while Pandya's last day of employment with Pixis was March 31, 2025, and his separation agreement was signed on April 30, 2025.

46.     On information and belief, the other Defendants were fully aware that Pandya was negotiating his exit from Pixis and conspired with Pandya to bargain for a significant severance payment from Pixis, which was intended to help fund Climaty.  The Defendants' intentional actions were not only intended to benefit themselves and their new company, but also harm Pixis financially and competitively.

47.     At the time of this negotiation, Pandya owed Pixis a duty to disclose any engagement in "any business or entity that competes, directly or indirectly, with the business of the Group Companies."  Pandya violated that duty.

48.     During negotiations for his exit from Pixis, Pandya omitted, concealed, or affirmatively misrepresented material facts, including (a) that  Pandya already had formed and was operating a directly competing business, Climaty; (b) that Pandya intended to use the severance payment to benefit Climaty; (c) that Pandya was taking a sabbatical for health reasons, and (d) that his poor performance at Pixis was a result of those health reasons.

49.     Pandya knew his misrepresentations and omissions would induce Pixis into entering into the agreement and intended for Pixis to be misled by his representations.

50.     Had Pandya disclosed his engagement with Climaty to Pixis during the negotiation over his exit from Pixis, Pixis would certainly not have paid Pandya any severance benefits, and Pandya would not have been entitled to any benefits because his conduct leading up to the incorporation of Climaty flagrantly violated clause 6.2 of the Pandya Employment Agreement, which provided clear grounds for a "for cause" termination.

51.     Fundamentally, Pandya's separation agreement was procured through fraud, including fraudulent misrepresentations and omissions specifically intended to deceive Pixis into signing the agreement and paying Pandya his substantial severance payment. In concert with the

14

other Defendants, Pandya concealed material facts from Pixis that fundamentally altered the nature of Pandya's separation, thereby inducing Pixis to pay Pandya severance benefits to which he was not entitled, and allowing Climaty to springboard off of Pixis's years of development and the reputation Pandya had gained as the CEO.

52.    To hide his unlawful conduct and that of his co-conspirators, Pandya negotiated with Pixis on his exit to retain the laptop computer he had been issued by Pixis. Patre also has refused to return her company-owned laptop following her termination, and continues to remain in possession of that company-owned laptop as of the date of this filing.  On information and belief, these laptops contain extensive evidence of Defendants' unlawful conduct and represent key evidence relevant to this dispute.

## F.    Defendants' Theft and Misappropriation of Pixis's Confidential Information and Trade Secrets

53.    As described above, Defendants worked in concert to misuse, steal, and misappropriate Pixis's confidential information and trade secrets, in furtherance of a scheme to start a direct competitor, Climaty, and harm Pixis's position in the marketplace.

54.    On information and belief, Pandya misused, stole, and/or misappropriated Pixis's confidential information and/or trade secrets, including at least confidential information and/or trade secrets related to Pixis's commercial strategy, technical information, data, and know-how, client relationships, client lists, and prospective client lists, and used that confidential information and trade secrets to form and operate Climaty.

55.    For example, Pandya, through his role as CEO, had access to Pixis's most sensitive confidential information, including highly technical documents containing numerous trade secrets and confidential business information.  Specifically, for example, Pandya had access to high- and low-level technical documents detailing system architecture, data flow, networking, testing plans

and summaries, and more.    Additionally, for example, Pandya had access to technology development timelines and plans, case studies, and white papers explaining the technology underpinning Pixis's technology platform.  In sum, Pandya had access to all of the confidential information and trade secrets necessary to create a nearly identical system to Pixis's.  Pandya relied on that confidential information and trade secrets in developing Climaty's competing platform.

56.    The other Defendants also misused, stole, and/or misappropriated Pixis's confidential information and trade secrets, both on their own and through Pandya.

**G.    Climaty's Targeting of Pixis's Clients**

57.    Pixis has lost at least one client to date to Climaty.  One client began using Climaty's services in June 2025.  On information and belief, Pandya has also targeted at least two other companies with significant U.S. operations.

## IV.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**(Trade Secret Misappropriation under the Defend Trade Secrets Act Against All Defendants)**

58.    Pixis incorporates by reference the allegations contained in sections III.A-G.

59.    Rao, Pandya, Chaturvedi, and Patre expressly agreed that they would not, at any time during or after their relationship with Pixis, use or disclose Pixis's confidential information, including trade secrets, except as authorized by Pixis in connection with their relationship, duties, and obligations. Even apart from these written contractual agreements, Defendants have a duty to refrain from using or disclosing Pixis's trade secrets without Pixis's permission.

60.    The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836(b)(1), creates a private right of action for "[a]n owner of a trade secret that is misappropriated … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."

61.     Defendants misappropriated by improper means Pixis's trade secrets, including (but not limited to): (a) non-public information about Pixis's clients and prospects; (b) the specifications, terms and pricing of Pixis's agreements with its clients and prospective clients; (c) highly confidential financial information; (d) business strategies; (e) intellectual property strategies, and (f) the technology underpinning Pixis's platforms and products.

62.     Pixis was using these trade secrets in connection with providing its products and services in interstate U.S. commerce and foreign commerce, Pixis took reasonable steps to maintain the secrecy of these trade secrets, and these trade secrets were not generally known or readily ascertainable by other persons who could obtain economic value from their disclosure or use.

63.     The efforts that Pixis takes to protect its trade secrets include at least the following security measures: (a) Pixis requires physical security measures at each of its office locations to prevent unauthorized access; (b) Pixis requires two factor authentication for all systems, ensuring only authorized users can access Pixis systems and documents; (c) Pixis uses secure data repository platforms, for storage of internal data; and (d) Pixis uses software to enforce device encryption across all company managed devices.  Further, Pixis's company policy requires employees, consultants, advisors, and vendors to execute an NDA before they are given access to the company systems, and those agreements are entered into and enforced.

64.     Pixis was the owner of these trade secrets because it had rightful title to the trade secrets, having developed and protected them as described above.

65.     Defendants misappropriated Pixis's trade secrets by, among other things, using them other than as authorized by Pixis to start and operate their competing business.

66.     With respect to Defendants Climaty and Turbostart in particular, they misappropriated Pixis's trade secrets by acquisition and use of the Pixis's trade secrets from another, specifically, either Rao, Pandya, Chaturvedi, or Patre, as part of Defendants' scheme to unfairly compete with Pixis.

67.     On information and belief, Defendant Patre additionally misappropriated Pixis's trade secrets by disclosing the trade secrets without express or implied consent, to Pandya after his departure from Pixis, in furtherance of his scheme to unfairly compete with Pixis.

68.     Defendants Rao, Pandya, Chaturvedi, and Patre's misappropriation of Pixis's trade secrets was done with knowledge at the time of misappropriation that Pixis's trade secrets were acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

69.     Defendants Climaty and Turbostart acquired Pixis's trade secrets through or from persons – Rao, Pandya, Chaturvedi, and/or Patre – who knew or had reason to know that the trade secrets were acquired by improper means.

70.     Defendants Rao, Pandya, Chaturvedi, and Patre used improper means to acquire Pixis's trade secrets because they acquired such knowledge by breaching their contractual obligations to maintain their secrecy and/or limit their use.

71.     Defendants knew or had reason to know that their knowledge of Pixis's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use because they entered into agreements which explicitly provided for the protection of Pixis's confidential information, including trade secrets.

72.     Notwithstanding this knowledge, Defendants each used and/or disclosed Pixis's trade secrets without the express or implied consent of Pixis.

73.     By using and disclosing Pixis's trade secrets in furtherance of Defendants' scheme to start and operate a direct competitor, Defendants have caused monetary and non-monetary damages to Pixis.

74.     Defendants have been unjustly enriched by the information wrongly obtained from Pixis.

75.     Defendants' actions, including their misappropriation of Pixis's trade secrets, were willful and malicious.  Pixis, therefore, is entitled to exemplary damages up to two times the amount of damages awarded for the actual monetary losses suffered by Pixis and to recover its attorneys' fees.

76.     The aforementioned unlawful conduct of Defendants proximately caused damages to Pixis.  In addition to monetary damages, Pixis has suffered and will continue to suffer immediate and irreparable harm to its business and goodwill with clients, prospective clients, and lead sources, for which it has no adequate remedy at law.

77.     By nature of Defendants continuing to possess Pixis's confidential information, including trade secrets, Pixis is at risk of Defendants' continued use and disclosure of its trade secrets.

78.     There is substantial threat that Pixis will suffer irreparable injury to its business and operations if the injunction is not granted in order to enjoin Defendants from using the trade secrets taken from Pixis or disclosing them to or with others.

79.     Any harm to Defendants, should preliminary injunctive relief be granted to restore the status quo ante, would be far outweighed by the harm to Pixis if no such relief were granted.  Further, granting the injunction will not disserve the public interest.  Indeed, the public interest supports the issuance of an injunction to protect Pixis's confidential information, including trade

secrets, during this litigation, and to prevent unlawful competition and misappropriation of trade secrets.

80.     A preliminary and permanent injunction enforcing, restraining, and enjoining Defendants from further misappropriation, use, or disclosure of Pixis's trade secrets is reasonably necessary to preserve the status quo and protect Pixis's legal rights pending in this litigation.

### SECOND CLAIM FOR RELIEF

**(Trade Secret Misappropriation under the Delaware Uniform Trade Secrets Act Against All Defendants)**

81.     Pixis incorporates by reference the allegations contained in sections III.A-G and the First Claim for Relief.

82.     Rao, Pandya, Chaturvedi, and Patre expressly agreed that they would not, at any time during or after their relationship with Pixis, use or disclose Pixis's confidential information, including trade secrets, except as authorized by Pixis in connection with their relationship, duties, and obligations. Even apart from these written contractual agreements, Defendants have a duty to refrain from using or disclosing Pixis's trade secrets without Pixis's permission.

83.     Defendants misappropriated by improper means Pixis's trade secrets, including (but not limited to): (a) non-public information about Pixis's clients and prospects; (b) the specifications, terms and pricing of Pixis's agreements with its clients and prospective clients; (c) highly confidential financial information; (d) business strategies; (e) intellectual property strategies, and (f) the technology underpinning Pixis's platforms and products.

84.     Pixis was using these trade secrets in connection with providing its products and services in interstate U.S. commerce and foreign commerce, Pixis took reasonable steps to maintain the secrecy of these trade secrets, and these trade secrets were not generally known or

readily ascertainable by other persons who could obtain economic value from their disclosure or use.

85.    The efforts that Pixis takes to protect its trade secrets include at least the following security measures: (a) Pixis requires physical security measures at each of its office locations to prevent unauthorized access; (b) Pixis requires two factor authentication for all systems, ensuring only authorized users can access Pixis systems and documents; (c) Pixis uses secure data repository platforms, for storage of internal data; and (d) Pixis uses software to enforce device encryption across all company managed devices.    Further, Pixis's company policy requires employees, consultants, advisors, and vendors to execute an NDA before they are given access to company systems, and those agreements are entered into and enforced.

86.    Pixis was the owner of these trade secrets because it had rightful title to the trade secrets, having developed and protected them as described above.

87.    Defendants misappropriated Pixis's trade secrets by, among other things, using them other than as authorized by Pixis to start and operate their competing business.

88.    With respect to Defendants Climaty and Turbostart in particular, they misappropriated Pixis's trade secrets by acquisition and use of the Pixis's trade secrets from another, specifically, either Rao, Pandya, Chaturvedi, or Patre, as part of Defendants' scheme to unfairly compete with Pixis.

89.    On information and belief, Defendant Patre additionally misappropriated Pixis's trade secrets by disclosing the trade secrets without express or implied consent, to Pandya after his departure from Pixis, in furtherance of his scheme to unfairly compete with Pixis.

90.     Defendants Rao, Pandya, Chaturvedi, and Patre's misappropriation of Pixis's trade secrets was done with knowledge at the time of misappropriation that Pixis's trade secrets were acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

91.     Defendants Climaty and Turbostart acquired Pixis's trade secrets through or from persons – Rao, Pandya, Chaturvedi, and/or Patre – who knew or had reason to know that the trade secrets were acquired by improper means.

92.     Defendants Rao, Pandya, Chaturvedi, and Patre used improper means to acquire Pixis's trade secrets because they acquired such knowledge by breaching their contractual obligations to maintain their secrecy and/or limit their use.

93.     Defendants knew or had reason to know that their knowledge of Pixis's trade secrets was acquired under circumstances giving rise to a duty to maintain their secrecy or limit their use because they entered into agreements which explicitly provided for the protection of Pixis's confidential information, including trade secrets.

94.     Notwithstanding this knowledge, Defendants each used and/or disclosed Pixis's trade secrets without the express or implied consent of Pixis.

95.     By using and disclosing Pixis's trade secrets in furtherance of Defendants' scheme to start and operate a direct competitor, Defendants have caused monetary and non-monetary damages to Pixis.

96.     Defendants have been unjustly enriched by the information wrongly obtained from Pixis.

97.     Defendants' actions, including their misappropriation of Pixis's trade secrets, were willful and malicious.  Pixis, therefore, is entitled to exemplary damages up to two times the

amount of damages awarded for the actual monetary losses suffered by Pixis to recover its attorneys' fees.

98.　　The aforementioned unlawful conduct of Defendants proximately caused damages to Pixis.  In addition to monetary damages, Pixis has suffered and will continue to suffer immediate and irreparable harm to its business and goodwill with clients, prospective clients, and lead sources, for which it has no adequate remedy at law.

99.　　By nature of Defendants continuing to possess Pixis's confidential information, including trade secrets, Pixis is at risk of Defendants' continued use and disclosure of its trade secrets.

100.　　There is substantial threat that Pixis will suffer irreparable injury to its business and operations if the injunction is not granted in order to enjoin Defendants from using the trade secrets taken from Pixis or disclosing them to or with others.

101.　　Any harm to Defendants, should preliminary injunctive relief be granted to restore the status quo ante, would be far outweighed by the harm to Pixis if no such relief were granted. Further, granting the injunction will not disserve the public interest.  Indeed, the public interest supports the issuance of an injunction to protect Pixis's confidential information, including trade secrets, during this litigation, and to prevent unlawful competition and misappropriation of trade secrets

102.　　A preliminary and permanent injunction enforcing, restraining, and enjoining Defendants from further misappropriation, use, or disclosure of Pixis's trade secrets is reasonably necessary to preserve the status quo and protect Pixis's legal rights pending in this litigation.

### THIRD CLAIM FOR RELIEF

### (Conversion Against Patre)

103.　　Pixis incorporates by reference the allegations contained in sections III.A-G.

104.    During her employment with Pixis, Defendant Patre was issued a company laptop. Patre's company-issued laptop was and is exclusively the property of Pixis, and upon her termination from Pixis, Patre was obligated to return her company-issued laptop.  She refused to do so.  The laptop not only contains Pixis's confidential information and trade secrets, it also contains evidence of Defendants' unlawful conduct.

105.    Patre's refusal to return her company-issued laptop constitutes conversion of company property.  On information and belief, Patre knew or should have known that the company-issued laptop was the property of Pixis, and that she was obligated to return the company-issued laptop to Pixis at the end of her employment.

106.    On information and belief, Patre kept the company issued-laptop to help conceal Defendants' scheme to unfairly compete with Pixis.  Defendants were aware of Patre's conduct and her obligations to Pixis, and aided, abetted, encouraged, and participated in her theft of this company resource.

107.    Patre's refusal to return her company-issued laptop deprives Pixis of its ability to use the company-issued laptop, including Pixis' ability to investigate for evidence of Defendants' scheme.

108.     Pixis seeks all monetary damages proximately caused by the theft and use of the company-issued laptop.

### FOURTH CLAIM FOR RELIEF

### (Fraud Against Pandya)

109.    Pixis incorporates by reference the allegations contained in sections III.A-G.

110.    Defendants conspired over the course of two years to obtain confidential information through deliberate concealment and omission of material facts related to their business dealings related to Climaty.  Additionally, Pandya, in concert with the other Defendants, concealed

material facts that fundamentally altered the nature of Pandya's separation from Pixis, allowing Climaty to springboard off Pixis's years of development and Pandya's reputation. Finally, Pandya obtained a substantial payment from Pixis as part of Pandya's separation agreement, again, by deliberately concealing or omitting material facts.

111. At the time Pandya was negotiating the separation agreement and his severance payment—throughout the month of March 2025—Pandya owed Pixis a duty to disclose any engagement in "any business or entity that competes, directly or indirectly, with the business of the Group Companies." Flouting this duty, Pandya—in concert with the other Defendants—was already operating his competing business, Climaty. The other Defendants were fully aware of the fact that Pandya was negotiating his exit from Pixis and conspired with Pandya to bargain for a clean exit and significant severance payment intended to help fund Climaty. Pandya omitted and concealed material facts from Pixis during the negotiation of his separation agreement, including (a) that Pandya already had formed and was operating a directly competing business, Climaty, and (b) that Pandya intended to use the severance payment to benefit Climaty. Further, Pandya affirmatively misrepresented material facts, including: (c) the false pretense that that he was taking a sabbatical for health reasons, and (d) that his poor performance was a result of health reasons. Pandya knew his misrepresentations and omissions would induce Pixis into entering into the agreement and intended for Pixis to be misled by his representations

112. Defendants' actions in conspiring to obtain Pandya's clean exit and severance payment intended to benefit Defendants by jumpstarting their new company and harming Pixis financially and competitively. By omitting or concealing the formation of a direct competitor, Climaty, Pandya exited Pixis unscathed. Instead of a "for cause" termination due to his flagrant violation of clause 6.2 of his employment agreement, Pandya separated amicably. Pixis even

posted an encouraging LinkedIn post upon Pandya's departure: "After an incredible journey leading our EMEA & APAC business, Neel Pandya is moving on from Pixis.  His leadership helped shape our growth story, scale new markets, and build phenomenal teams.  We're deeply grateful for everything he brought to Pixis and wish him the very best for his next adventure."

113.    The fraudulent scheme peaked in or around March 2025 but began years before. On information and belief, Rao, Patre, Chaturvedi, and Turbostart conspired to build the foundation of Climaty using confidential and trade secret protected information that the Defendants accumulated over the course of roughly three years.  The scheme began with Pandya's introduction of Rao and Chaturvedi to Pixis in late 2021.  In March 2025, the Defendants played an active role shaping Pandya's exit.  Indeed, Turbostart went on to invest $2 million in Climaty in September 2025, thereby capitalizing on Climaty's unfair head start obtained through the fraudulent foundation of Climaty's launch.  Climaty benefited by springboarding itself into the market riding on Pandya's reputation that was backed by Pixis's endorsement on LinkedIn.

114.    Pixis justifiably relied on Pandya's representations and omissions, including Pandya's failure to inform Pixis that he (along with the other Defendants) was forming and operating a competing company.  Pandya's representations created a false impression that his separation and severance requests were made in good faith and for legitimate reasons unrelated to a competing venture.  Pandya's representations included the false pretense that he was taking a sabbatical for health reasons.  Had Pixis known that Pandya and the other Defendants had already formed and were operating Climaty, Pixis would not have agreed to pay the severance.  Pixis certainly would not have "wish[ed] him the very best for his next adventure" had Pixis known that his "next adventure" would be forming a direct competitor that misappropriated Pixis's technology, strategies, clients, know-how, and goodwill.  Pixis's reliance directly and proximately

caused its monetary loss based on Pandya's severance and Pixis's lost profits because of Climaty's fraudulent head start in the hyper-competitive realm of AI marketing technology.

115.    Because of Defendants' fraudulent conduct, Pixis is entitled to an award of monetary damages proximately caused by Defendants' fraud.

### FIFTH CLAIM FOR RELIEF

### (Fraudulent Inducement Against Pandya)

116.    Pixis incorporates by reference the allegations contained in sections III.A-G and the Fourth Claim for Relief: Fraud Against Pandya.

117.    Pandya negotiated the terms of his separation agreement from Pixis in order to conceal Defendants' scheme and secure a severance payment from Pixis to be used in furtherance of Pandya's and Climaty's business objectives.  Pandya negotiated the terms of his separation agreement under the false pretense that that he was taking a sabbatical for health reasons, when in fact he was actively launching and operating Defendant Climaty.  Defendant knew his misrepresentations and material omissions would induce Pixis into entering into the agreement and intended for Pixis to be misled by his representations.  Further, Pandya included in the separation agreement his retention of his company-issued laptop specifically because his company-issued laptop contains evidence of Defendants' scheme and/or Pixis's confidential information and trade secrets.

118.    Pixis reasonably relied on Pandya's false representations and material omissions when entering into the separation agreement with Pandya.  As a direct and proximate result of Pandya's intentional misrepresentations and Pixis' reasonable reliance thereon, Pixis entered into the separation agreement with Pandya.

119.     Because of Pandya's fraudulent conduct, Pixis is entitled to an award of monetary damages proximately caused by Defendants' actions and recission and/or avoidance of Pandya's separation agreement.

## SIXTH CLAIM FOR RELIEF

### (Recission Against Pandya)

120.     Pixis incorporates by reference the allegations contained in III.A-G and the Fourth Claim for Relief: Fraud Against All Defendants and the Fifth Claim for Relief: Fraudulent Inducement Against Pandya.

121.     As alleged above, the separation agreement entered into by Pixis and Pandya was a result of intentional misrepresentations and omissions by Pandya, amounting to fraud and fraudulent inducement.

122.     As a result of Pandya's fraudulent conduct, on which Pixis justifiably relied in entering into the separation agreement, Pixis is entitled to recission of the separation agreement and recoupment of the amounts paid to Pandya under the separation agreement.

## SEVENTH CLAIM FOR RELIEF

### (Tortious Interference with Business Relationships Against All Defendants)

123.     Pixis incorporates by reference the allegations contained in III.A-G and the Fourth Claim for Relief: Fraud Against All Defendants.

124.     At all material times, Pixis had business relationships with existing and prospective clients seeking Pixis's products and services.

125.     Pixis has invested significant time, money, and resources in developing these relationships.

126.    Defendants knew of Pixis's business and contractual relationships with existing and prospective clients.

127.    On information and belief, while Defendants Pandya and Patre were still employed at Pixis, Defendants Pandya and Patre tortiously interfered with these business and contractual relationships by, among other things, actively soliciting Pixis's clients and prospective clients to form business and contractual relationships with Defendants' newly-formed direct competitor, Climaty.

128.    Likewise, on information and belief, Defendant Rao tortiously interfered with Pixis's business and contractual relationships by, among other things, actively soliciting Pixis's clients and prospective clients to form business and contractual relationships with Defendants' newly-formed direct competitor, Climaty, while still bound by the Advisor agreement with Pixis that prevented such actions.

129.    For example, due to solicitation by Defendants, on information and belief Pixis's client Lighthouse began using Climaty's services in June 2025.

130.    Defendants performed these actions for the benefit and competitive advantage of Pixis's direct competitor, Climaty.

131.    As a direct and proximate result of Defendants' continuous tortious interference with Pixis's clients and prospective clients, Pixis has suffered and will continue to suffer irreparable injury that cannot be fully compensated by money damages.

132.    In addition to the irreparable harm described herein, Pixis has a substantial likelihood of success on this claim; any harm to Defendants, should preliminary injunctive relief be granted to restore the status quo ante, would be far outweighed by the harm to Pixis if no such relief were granted; and the public interest favors such relief.  Balancing such factors, Pixis is

entitled to the remedy of preliminary injunctive relief, as well as permanent injunctive relief as prayed for below.

133.     Although money damages alone are inadequate to compensate Pixis for Defendants' wrongdoing, Pixis also is entitled to an award of damages against Defendants for their intentional interference with Pixis's relationships with its clients and prospective clients, including, but not limited to, the costs of conducting an investigation into Defendants' conduct, the costs of taking corrective action, and damages to its reputation and resulting financial losses, such amounts to be determined at trial.

134.     Defendants' conduct was willful and, therefore, Pixis is entitled to an award of exemplary and punitive damages.

### EIGHTH CLAIM FOR RELIEF

### (Unjust Enrichment Against All Defendants)

135.     Pixis incorporates by reference the allegations contained in III.A-G and the Fourth Claim for Relief: Fraud Against All Defendants.

136.     The facts set forth above herein demonstrate that Defendants intentionally acted in a manner that has unfairly enriched, and will continue to unfairly enrich, Defendants at the expense of and detriment to Pixis.

137.     It would be against equity and good conscience for Defendants to retain the benefits of their actions, including the misappropriation of trade secrets and stolen confidential information, without paying Pixis for them.

138.     As a result of Defendants' actions, Pixis has incurred monetary damages as well as other substantial damages that are irreparable and cannot be fully or adequately measured or compensated by monetary relief.

## NINTH CLAIM FOR RELIEF

### (Conspiracy Against All Defendants)

139.    Pixis incorporates by reference the allegations contained in III.A-G and the Fourth Claim for Relief: Fraud Against All Defendants.

140.    Defendants conspired, and continue to conspire with one another, to unfairly compete with Pixis as alleged herein.

141.    The scheme by Defendants alleged herein constitutes a conspiracy to do an unlawful act, or a lawful act by unlawful means.

142.    Each Defendant was aware of the scheme as well as Defendants' respective acts in furtherance of the scheme and assisted in the scheme's execution.

143.    Defendants conspired together, on information and belief, with the full knowledge that doing so was contrary to their duties owed to Pixis, that doing so constituted improper use of confidential information, and that doing so constituted misappropriation of Pixis's trade secrets.

144.    The acts by Defendants constitute acts in furtherance of the conspiracy with one another, including, but not limited to, the following acts: (a) forming and operating a direct competitor to Pixis, (b) stealing Pixis's confidential and trade secret protected material, (c) churning Pixis clients for Climaty's benefit, (d) using Pixis's confidential business strategies for the benefit of Climaty, and (e) planning and encouraging each other to take the above actions.

145.    As a result of Defendants' actions, Pixis has incurred monetary damages as well as other substantial damages that are irreparable and cannot be fully or adequately measured or compensated by monetary relief

## V.    JURY DEMAND

146.    Pixis hereby demands a trial by jury on all issues and claims so triable.

## VI.    PRAYER FOR RELIEF

147.    Pixis respectfully requests the following relief:

A.    An order from this Court that temporarily, and on an *ex parte* and preliminary basis until a final hearing, and permanently thereafter, restrain and enjoin Defendants from directly or indirectly operating a competing business using Pixis's stolen confidential information and misappropriated trade secrets;

B.    Monetary damages sufficient to compensate Pixis for Defendants' unlawful conduct, including an appropriate award of double and punitive damage;

C.    Pixis's costs, expenses, and reasonable attorneys' fees; and

D.    Such other and further relief as the Court may deem just and proper.

October 17, 2025                              Respectfully submitted,

                                             /s/ Joanna J. Cline
                                             _____

                                             Joanna J. Cline (DE # 5873)
                                             Emily Wheatley (DE # 6383)
                                             Joanna.Cline@Troutman.com
                                             Emily.Wheatley@Troutman.com
                                             TROUTMAN PEPPER LOCKE LLP
                                             Hercules Plaza, 1313 N. Market Street
                                             Suite 1000
                                             Wilmington, DE 19801
                                             Tel: 302.777.6500

                                             John "Evan" S. Gibbs III
                                             Evan.Gibbs@Troutman.com
                                             (*Pro Hac Vice* forthcoming)
                                             TROUTMAN PEPPER LOCKE LLP
                                             600 Peachtree Street, NE, Suite 3000
                                             Atlanta, GA 30308
                                             Tel: 404.885.3000

                                             Gwendolyn Tawresey
                                             Gwendolyn.Tawresey@Troutman.com
                                             (*Pro Hac Vice* forthcoming)
                                             TROUTMAN PEPPER LOCKE LLP
                                             111 Huntington Ave, 9th Floor
                                             Boston, MA 02199
                                             Tel: 617.204.5100

                                             ***Counsel for Plaintiff Aiquire Inc., d/b/a Pixis***